And we will hear first from Mr. Pettit, and you may proceed when you're ready. Thank you, and good morning, Your Honors. I hope to reserve five of my 20 minutes for rebuttal. May it please the court, the district court erred by failing to resolve this case on the party's cross motions for summary judgment because there were no disputed issues of material fact and the relevant contract language was not reasonably susceptible to the interpretations provided by the general partners. This court accordingly can and should exercise its de novo review to reverse the outcome below and enter judgment in appellant's favor. As the court may be aware, the threshold and ultimate issue in this case is whether the partnership desired to accept a bona fide offer from an un... Let me ask you, because I was a little confused from the briefing, what is your position on when it says that the owner shall desire to accept a bona fide offer, what's your view as to who exercises the owner's power with respect to that issue? Who has the power to execute a sale? So the owner obviously is the partnership, and there are four partners in the partnership, two limited partners and two general partners. And our position is that all of the partners have to agree to... I mean, well, the red brief seemed to say that you had conceded the opposite, and then the reply brief seemed to let that go without comment. Am I reading that wrong? Your Honor, I believe that the point that we wanted to make is because none of the partners desired to accept the offer, the partnership could not have accepted the offer. And we made a... Suppose the general managers wanted to accept an offer just, you know, hypothetically, and the limited partners did not. Would the limited partners have the authority, in your view, to block the sale? Yes, Your Honor. If there's a distinction between the exercise of the option, which can be unilaterally exercised against the... Even if the limited partners, you know, want to stay in the partnership. The right of first refusal, our position is that the limited partners have to desire to sell the property. But as Your Honor is sort of picking... And what is that based on? I mean, do we have to go look at the partnership document to figure out who exercises the owner's authority with respect to this issue? Your Honor, yes, you look to the partnership agreement. The partnership agreement is clear that the partnership cannot sell the property unless the limited partners agree. Other than as provided in the option agreement, which lands us back to this question. That's right, Your Honor. And I think that the reason why that parenthetical was included in the partnership agreement was because in the absence of that parenthetical, theoretically, the limited partners could block the exercise of the option because the option involves the sale of the property. And if the partnership agreement says that the limited partners have to consent to a sale of the property, it could undermine the unilateral aspect of the option. However, I don't think that we need to win on that issue, which is why we didn't really focus on it in our briefing. Because the reality is that none of the partners of the partnership desire to accept a third-party offer. And, you know, it's undisputed that the partnership did not desire to accept an offer. My clients repeatedly communicated that they have no interest in selling. And the general partners – How – doesn't that view of this make this language essentially nugatory? It's nice words on a page, but it will never be operative in the real world. If the limited partners have the ability to block the consent or – No, you're reading about what constitutes a desire to accept a bona fide offer. That it has to be a genuine desire to accept a purchase offer from a third party. Correct. That if that's what it means, then this provision is basically never going to be operative. I don't think that's right, Your Honor. I think that – It would mean that the general partner who has the right of first refusal would have to actually want to do the third-party sale, even though that would then trigger the right of first refusal, which looks pretty good by comparison. And so it puts us in a situation that it could only be operative based on a factual impossibility, and therefore it sort of drops off the page. I mean, that seems to be the biggest challenge to your argument. I think there are – so there are a couple of things. So one is there are two general partners, right? Only one of the general partners actually holds the below-market right of first refusal. And so the other general partner presumably doesn't have that conflict of interest and could evaluate the terms of a third-party offer and assess whether that offer would be in the best interest of the partnership to accept. And even – That partner seemed to like the right of first refusal. I'm sorry? That other general partner seemed to like the right of first refusal. That is, I think, a true statement in these factual circumstances. But the reality is under the contract, that general partner does not hold the right of first refusal. And even for Canopy, the party that does hold the right of first refusal, it's not impossible for a general partner that owes fiduciary duties to the partnership to wear two different hats and to look at the actual third-party offer, make an independent assessment as to whether accepting that offer would be in the best interest of the partnership, even though it knows in the back of its mind with its other ropher-holding hat that it would allow it to, you know, to trigger the ropher. And this is – the facts here are actually a very good example of that, where the – well, it was actually not an offer. It was a non-binding letter of intent, which I can get to next. But the letter of intent proposed a purchase of the property for, I believe it was, $45 million. And the broker's opinion of value that the general partners obtained prior to soliciting the letter of intent valued the property between $50 and $60 million. And the broker had suggested to the party that made the letter of intent, you know, why don't you offer $52 million? Now, they didn't. They offered $45 million. And we know that the general partners would not have desired to accept a $45 million offer for the purchase of the property. And how do we know that? We know that because the general partners' principal, David Nahas, I asked him this specifically at his deposition. Would you have – you know, putting aside the ropher, would you have accepted this offer? And they said – and he said, no, I would not have accepted this third-party offer without further negotiations. And then I asked him, and you didn't engage in further negotiations, did you? And he said, that's right. And I said, and the reason why you didn't engage in further negotiations is because you had no interest in selling the property to a third party. Your interest was triggering the ropher. And he said, yes, that's right. And so there are – I mean the question this raises is, was there anything unambiguously in the contract that prevented them from doing that? Because that's your burden, right, to be able to prevail on summary judgment. And so I guess I come back to Judge Collins' question, which is, under your view, what exactly did they need to – your position, I take it, is the right of first refusal is something they can use eventually. It's not completely nuggatory. But so what more did they have to do? They had to basically play along further with the positive offer. They had to engage with them a couple more rounds and get to that point. And then you would say, all right, at that point that was enough process, if you will, that they could then exercise the right of first refusal? So I want to answer your question directly, and then I also want to address the nuggatory – the statement of it being nuggatory because I think that even in the absence of it being exercised, it's not nuggatory. I think it has value independent of its exercise. But what would have to happen is, first of all, there would have to be an actual enforceable offer. And the case law is very clear on that. Even the cases that the general partners rely on, the pathway case and the homeowners rehab case, all say that, you know, at a minimum, an offer needs to be an enforceable offer in order for it to trigger the right of first refusal. That's an independent requirement. On the desire to accept, what we're saying is that there actually has to be an evaluation of the merits of the offer that's being tendered by the third party to assess whether that – accepting that offer would be in the best interest of the partnership. And the fact that there could be a collateral consequence of that analysis and that – All of the partners have to agree for this condition that the owner desires to accept the bona fide? All of the partners have to agree to that? Our position is that all of the partners have to agree, but at a minimum, one of the partners has to feel – has to have a genuine desire to accept. Well, which is it? What's the rule? Is it all of them or is it sufficient if it's just one? It's – I would say that it has to be all of them. I mean because if it's all of them, then the partner who has the right of first refusal is never going to, in fact, subjectively desire the third party transaction. I don't think that – It creates a sort of factual impossibility. Well, I don't think that's right, Your Honor, because, again, I think that Canopy can evaluate the offer on its merits and say if I didn't have this roofer, I would – this would be in the best interest of the partnership. And I also want to point – and I want to talk to this right – the way that this Congress structured this and the way that the parties structured this was they gave the Canopy two rights. One was an option that could be exercised unilaterally and that could be exercised without the limited partner's consent. Without the other general partner's consent, it had carte blanche. If it wanted to exercise – if it wanted to purchase the property, it had a mechanism for doing that. Then it had the Section 6, which is kind of like a standalone section in the purchase option agreement. What that is – and it's a blocking right. Rights of first refusal are, by their nature, defensive, preemptive rights that are only triggered in the event that there's a desire to sell and a desire to sell the property. Now, you may ask, well, then why would you have that in there? What value does it create for the nonprofit to have that right of first refusal in there? Well, the value that it has is that the limited partners have a forced sale right. That forced sale right begins to run on the same day that the right of first refusal begins to run. And in the absence of the right of first refusal, the limited partners could say – could order the general partners, you need to go and sell this property to a third party for fair market value. And then the canopy, the nonprofit, would have to say, oh, well, even though I have a four-year option period, I'm now stuck in a situation where I need to immediately – So, counsel, if this were just a straight-up contractual relationship without the statutory backdrop, there's a lot of merit to your argument about what a right of first refusal means. It feels like it has some kind of established meaning. Congress then uses it in the statute. But as the Sixth Circuit points out, you know, it doesn't really mean what it looks like. Congress had to structure this in a way to avoid certain kinds of tax consequences with the IRS. And it really means something different because, as Judge Collins has pointed out, it will never get exercised and it will frustrate the program that Congress has set up. So what's wrong with that reasoning? So a couple of things. One is that Congress actually engaged in this analysis. They considered whether to grant a below-market option or a below-market right of first refusal. And that's in the Senate reports and the House reports that we cite to in our briefs. And what they said was, if we give the nonprofit a below-market option, it will take away the ownership rights of the investor to such an extent that it will no longer be considered the owner of the property and, therefore, will not have the ability to the tax credits. You have to remember that this tax program was adopted in 1986 as a way of – as part of the larger Tax Reform Act where they were trying to get rid of these passive tax shelters. And so Congress decided we want to make sure that the owner of the property – now, remember, the limited partner is the 99.99% owner of the partnership, and that's how the program is structured. Now, they have to have some ability to ensure that they could have upside potential if the property appreciates in value over the life of their investment. And if we allowed the option to be exercised unilaterally, then they would take away their ability. So Congress specifically understood this. And so that's the reason why this specific agreement, which affirmatively includes the bona fide offer and the desire to accept, can't be interpreted in the way that the general partners advocate. Because if they did, it would essentially – they refer to it as, oh, the ROFR is just a mere technicality. It's just something that you've got to sort of check the boxes of soliciting an offer. But at the end of the day, we get the property, and we get it for the below market price. And Congress said, no, you don't get to – this is the tax code. The tax code doesn't allow you to just say, oh, well, something's a technicality. There's substance that has to be associated with it. Do you want to save time for rebuttal? I would, Your Honor. Okay. Thank you. If there are no questions at this point, I'll save time. Thank you. Thank you. And so we will hear now from Mr. Davenport. Thank you, Your Honor. If it may please the Court, it's a privilege to be here. We've been litigating these types of cases now for more than a decade. And it's a privilege to be here and hearing the questions that you're asking because they are the questions that the courts that we've been before in the past have asked. What does this mean if it can't be meaningfully utilized? At the same time, under California law, it has to be a reasonable reading of the words. And the words that are in here is that the owner shall desire to accept a bona fide offer from an unrelated third party. So the noun phrase that is the object of the desire to accept is not just an offer or not an offer to trigger right of first refusal. It's desire to accept an offer from an unrelated third party. That condition is just not met on the facts. So no one desired to accept the offer from the third party. They desired to accept it for purposes of triggering the roofer, which was consistent with the reason it was there in the first place. And everybody knew going in the original parties made it very clear in our estimation under the limit. It's a desire to have it for purposes attributed. No one desired to actually accept it. I mean, it's weird. Why isn't it written as upon receipt of a bona fide office? Then that would work exactly as you said, but it's just not written that way. It doesn't say that. And so this looks like a case where the words don't fit. But for reasons of congressional purpose, we're supposed to distort the words to come up with something else. That's what this sounds like, because it's the words just are not met. And I can't stretch them so that they're met on the facts of this case. Help me out. Two things to that. One, I believe that may justify why Judge Carter ruled that it was ambiguity and we needed to have a trial and evaluate what was the intent. Because this this is unclear, because, as you say, we have to look behind that to figure out what it means. And so we had a trial on that. The second thing is it also does not say that there has to be a genuine desire to accept. It does not say there has to be a desire to sell. And that's really what they're getting at is they're getting at. There has to be a genuine desire to sell to that third party at a binding enforceable offer. Not desire to have received. Consider it's a desire to accept a bona fide offer from an unrelated third party. How can I read that that that condition was met? Because that condition was met because you had a bona fide offer. It was from an unrelated third party. And the general partner canopy was vested with full authority to express any desire of the partnership. Only canopy can do that as a general partner. The limited partners cannot. They were excluded from any such right under the terms and conditions of the partnership. You disagree with them. You when it says owner shall desire to accept that that power is only the general partners and not the limited partner. I fully disagree with his position. And the partnership agreement makes it manifestly clear that as the general partner, they have full and exclusive authority to manage the partnership for its purposes, which includes the charitable purposes for which the partnership was designed. And that's at Section 2.5 A of the partnership agreement and Section 5.1 A of the partnership agreement. Further, what they're really trying to do is 5.5 says notwithstanding any other provisions of this agreement, the general partners shall not have the authority to do any of the following. One is sell any or all or any portion of the apartment complex or modify or refinance the mortgage, et cetera. Except is specifically provided in this agreement or in the option agreement. And that seems to beg the question. I would say, Your Honor, that's the carve out that you identified earlier, which means they don't have a consent right in their ability to weigh in on whether or not there's a desire to accept. But his response was that when you get to the option agreement, then you you do have a derogation in that there's an absolute unconditional right to exercise the option without the limited partners consent. But is it clear from this language in paragraph six of the of the option agreement that this creates an exception to the requirement to have the limited partners consent to a sale? I believe so, Your Honor. I think when he responded to your question and he suggested, well, the reason that the carve out is there is because of the option component of the option agreement and not the roofer or not the totality of the option agreement. That is not supported by the record, nor is it supported by the plain language of this agreement. Where's the language in the roofer provision in paragraph six? That makes equally clear as the option provision that it can be exercised without the consent of the limited partner. Where's the language in paragraph six about the roofer that makes is equally clear as the language about the option that the roofer can be exercised or rather that the desire to accept the property can be exercised over limited partners objection? I believe it's within the definition of owner because only the owner can express that desire. And the owners is defined as the partnership that sends you back to the partnership agreement, which sent us back here, which is why I'm confused. But the partnership agreement tells us that the voice and decision making authority for the owner is the general partner. And so they work in concert with one another, and I just don't see anything in paragraph six or anywhere in the option agreement that would suggest that. The carve out that we see in five point five be Roman at four is only in relation to the option component of the option agreement, because the carve out specifically says the option agreement. It doesn't say the whole agreement. And so what I think we see happening here is because when you look at five point four be Roman at one, this says that notwithstanding any provision of the agreement to the contrary, but subject to the purchase option and consent rights required by the lender. This further subordinates any right that they may have to force a sale. So he brought up the concept of, well, the roofer could have some value because my client has the right to force a sale. But his client doesn't have a right to force a sale because it's subject to the purchase option agreement, because it's section five point four B two. It specifically says subject to five point one B one hereof. They will have a right to force a sale. So their ability to force a sale is dependent upon whether or not my client exercises the option agreement and or the roofer. So they can't just say force a sale and then that triggers. So under their view of of the agreements, how would this work out in practice? So you just sort of stuck with each other until you all agree to sell. And then at that point, it's inevitably going to be the roofer exercise or how would it work in a practical under their view? Under their view, they will have purchased JP Morgan's position for two and a half million dollars. They will defeat the roofer. They will make it entirely impractical, meaningless, illusory. It'll never be exercised. It will expire and be gone because it's only available for four years after the end of the roofer period. They will then force the sale of the property under that right because the option agreement is gone. And it's the time limited nature that creates because then the deadlock would would run the clock out and then the roofer would disappear. And that's their goal, because then the property can be sold at fair market value and pursuant to the capital transaction waterfall in the agreement. After all, debts and obligations are paid. They get ninety nine point nine nine percent of the equity. And the only reason they get ninety nine point nine nine percent of the equity, as the parties testified below, is because of the roofer. The expectation all along was that the publicly subsidized housing was going to appreciate in value and the nonprofit would be able to realize that value and then give them access to capital. In order to rehabilitate the property after 20 years of operation and pour more money back into the community and into the property, rather than having to come back to public subsidies and ask for more money in order to do things that the public subsidies have already accomplished. So the roofer is a beautiful tool that Congress created back in the 80s to establish this wonderful partnership between public and private institutions creating affordable housing. And when you have organizations like this who come in and say this is our goal, this is what they want to do. They told J.P. Morgan, sell us your positions. And there's a serious risk of litigation. So the value you have is diminished and the litigation is mixed. So they convinced J.P. Morgan, to whom they had a fiduciary duty, to sell their position for two and a half million dollars. Then they turned around and tried to defeat the roofer. And they want this court and every other court that they've been in front of to make it illusory. What steps does Canopy need to take in order to accomplish the roofer? Should we string along the third party buyer, get them close to the table, get them close to the table, we're ready to sign? Oh, we're not going to sign. That wouldn't be enough for them. They say we have to have an enforceable offer that triggers the roofer. That means the partnership has to breach the binding agreement that they want to be the bona fide offer. So when we think that through to its logical conclusion, they're creating another opportunity to remove the general partner to take away the roofer. Because if the general partner had engaged with positive investments and entered into a binding and enforceable purchase and sale agreement, which is what they say is the only way you can have a binding offer, we will breach the agreement. The partnership will be sued. The general partner will be removed because they'll say you breached your duties to the partnership by entering into a binding agreement. That's what they want. Every road that they create is an end point with a roadblock at the end, and there's no way for us to get there. And I think the Sixth Circuit recognized this in the South America case, often referred to it as Pathway because Pathway of Pontiac was the roofer holder in that case. And I think to Judge Bybee's question earlier, I mean, Congress called it a right of first refusal, but it's not a traditional common law right of first refusal because of the minimum purchase price and the nature of that. So you don't need to have these bells and whistles that you have in a common law roofer because the protections are there to make sure you get an offer that will protect the roofer holder. Here you have a partnership. If the offer was $100 million, would that have been enough for them? Probably not because the purchase price doesn't matter. And so we know from the First Circuit decision in the First Tenants Development Corporation, Congress created this special right. They called it a right of first refusal. They wanted to avoid tax implications and problems by having it function like an option. So they said, look, we need to, if there's a manifest intent to sell, you're good. But they didn't define any triggering mechanisms whatsoever in the statute. So what did they do? Three things have to be present. You have to have a qualified nonprofit organization, a qualifying organization, which includes a nonprofit. You have to have it available at the end of the compliance period, not before. And it has to be the minimum purchase price. It can be more, but it can't be less. And if you meet those three criteria, you have a right of first refusal. But it's not mandated. It's sui generis. It has to find its way into a contract. And so the parties are free to negotiate the terms and conditions of their contract. So as you'll see in this case, the guidepost that they created was a desire to accept a bona fide offer, but unrelated third party. Other partnership agreements that are in the record in the various other cases, they don't necessarily include that language. Some just say an offer. Some just say a bona fide offer. Whatever they've done, they've tried to create an opportunity for the general partner to trigger the ROFR. And they all know coming in, just like the original parties to this case knew. The original limited partners knew when this language was agreed to, Canopy was going to be the party making the decision on behalf of the partnership. We get to the end 15 years later, and they accuse them of self-dealing. They accuse them of trying to self-trigger. I think the lower court below looked at the circumstances just like the Sixth Circuit said and said, well, bona fide is undefined in the agreement. Well, what does that mean? There's some ambiguity there. So we're going to have to have a trial. The Sixth Circuit kicked it back down to the lower court to have a trial. It didn't happen because the case settled. Here, Judge Carter said we're going to have a trial on this issue. And when we have the trial, we're going to do it the same way the Sixth Circuit said, within the context of the program, within the context of the original party's intent. We're going to look at the extrinsic evidence, and we're going to try to accomplish what was the intent of the original parties. And the original parties were there. None of his clients were the original parties. Ronnie Thielen, she testified on behalf of Related. She was there. She was actually there at the Mitchell Danforth Commission when the program was put together and the Roper was established, and she went to work for Related. She negotiated the deal on behalf of the limited partner. She said this is what's supposed to happen. Mr. Nahas, he said this is what the LPs told me when they were negotiating. Ted Handel, who was the lawyer for the general partner at the time, said this is what we were told. This is what we were trying to accomplish. This is what we did. And so we get to the end, and they literally have no one who can testify from their client on what the original intent of the parties were because they weren't there. They were formed for the purpose of doing just this, trying to strip equity from affordable housing and require this property and many others like it to be sold at fair market value. And then it is going to be recapitalized through some other process rather than the equity that Congress intended to remain with the property so this would no longer need to be federally subsidized housing. They will have a balance sheet that has access to capital because all of the equity is supposed to remain with the property. And when the Roper holds as it should, the program works and the policy of Congress is effective. Now, I think that's it on my points. I'm sorry. Are there other cases that are pending in district courts in this circuit that raise some of these same issues? Do you know? I don't. There is one. Not in district courts. There is a state court case that we are litigating down in San Diego that implicates many of these same issues. Motions for summary judgment were teed up and now they were not decided. Was the case before Judge Selma appealed to this court? They put a lot of weight on his ruling on that case. Was that appealed to us? It was going to be appealed. Mr. Pettit and I were on that case. We've known each other for years. And Judge Selma made his decision. And the cornerstone of his decision was the Sun America case decided at the district court level. Which got reversed. And that was reversed. And so after Judge Selma issued his decision, a new case started where they were trying to now kick my client out of the partnership based on Judge Selma's rulings. The case before Judge Selma, was that just abandoned or was it appealed? It was basically abandoned. It was a settlement between the parties. It was a settlement. And so no appeal came because of the settlement. Would you just remind me of the circuit scorecard? So the Sixth Circuit decision favors your position. Are there other circuits that have taken the same position? I'm only interested in the circuits. The First Circuit did not have to ultimately reach the question. But it issued a very significant determination on how the roofer works and how the program works and what the intent of the parties. And you find that favorable? Highly. Okay. So you've got dicta. All right. Is there anybody else besides the Sixth? First. Second. How about going the other way? I'm sorry. How about going the other way? How about opposed to you? I am not aware of a circuit case that goes against us. The Seventh Circuit just recently affirmed last week a district court decision in a case involving a general partner's option. It wasn't a roofer case, but the lower court talked about how the program works and the significance of it. But in fairness, that was not a roofer case. Has this gone up to any state Supreme Courts as well? The Massachusetts Supreme Judicial Court and homeowners rehab, we call it the HRI case. That was very favorable for the nonprofit in that case. It then went back a separate case called Tenants Development Corporation, TDC. That went to the Massachusetts Supreme Judicial Court. Has any state Supreme Court gone against your position and in favor of the other side's position? Not that I'm aware of, Your Honor. The cases that I typically – that I believe they kind of hang their hat on, if you will, is the Senior Housing Assistance Group Shag case out of Washington State. And I think when you read the first two pages of that decision, it will inform the court as to why the case landed where it did because the court came out immediately and found credibility findings and unclean hands on behalf of the general partner and whatnot. And everything went against them after that. Are there other roofer cases that are pending in other circuits? I'm going through them in my head, Your Honor. I'm sorry. I don't believe any are pending in other circuits, at least not that I'm aware of. But as I talked about, that case did not go up on an appeal. The Washington case that I just mentioned that they cite, that ultimately did not go up on an appeal, as I recall it. Eastern District of Virginia in the Wesley housing case was decided favorably on behalf of our client. It was not appealed. The Delaware Chancery Court in J.E.R. Hudson issued really an enormously detailed decision on how rights of first refusal work and what's happening in our industry and how things are being disrupted in a very negative way. I think they had over 350 some odd footnote citations. The Chancery Court judge conducted a trial. The procedural posture of that case was a little different. You had two investors fighting with one another in an investment fund because my client down in Virginia had exercised the right of first refusal and acquired the property. And one of the investors in the fund went to the manager of the fund and said, go sue those people or we're going to kick you out of the investment fund. And the manager of the fund said, you're not kicking us out. They did what they were supposed to do. They followed the roofer and they duped it out up there. And the Chancery Court unpacked it all. And I think I'm out of time. And you are. All right. Thank you, counsel. We will hear rebuttal now. Thank you, Your Honor. And I'd like to start by sort of correcting the scorecard, if I might, because I disagree with the proposition that the Sixth Circuit found in favor of the position that's being advocated here. What the Sixth Circuit found was that there was a disputed issue of material fact as to whether the fact that the general partners solicited an offer undercut the bona fides of the offer. And said because under Michigan law, ambiguous contracts have to be resolved, have to go to a jury. We're going to send this down and go to a jury. And in that case, ultimately settled. However, OK, you've tried to distinguish it. Have you got any circuit cases that go in your favor? Yes. So the Sixth Circuit case, for example, the Sixth Circuit. Let's suppose I disagreed with you on that. Do you have any circuit that that squarely holds in your favor? Well, I think other than the Sixth Circuit, the Massachusetts. Well, the Massachusetts Supreme Judicial Court, which I understand is not a federal court, but it's the highest court in Massachusetts, also ruled that. And in both of those cases, there was no affirmative bona fide offer, no affirmative desire to accept in the contract itself. But in the Massachusetts case, they said by the nature of Section 42 I-7 and what Congress was trying to do, it has to be an enforceable offer to trigger the roofer, because otherwise it would have faced the distinction that Congress made between a right of first refusal and an option. And I want to go back to the plain language of this contract because opposing counsel said Congress didn't define right of first refusal and left the parties with the freedom to negotiate what requirements would need to be had in order to trigger the roofer. Here, the parties did negotiate it. They decided to affirmatively include in the contract that the partnership has to desire to accept a bona fide offer from an unrelated third party. Those words have to mean something. And under the opposing counsel's interpretation, they say, oh, well, that's just a guidepost and it's a technicality and you don't really need to honor those requirements. There doesn't have to be a genuine desire to accept. There doesn't have to be an actual offer. And Judge Collins, you asked that question right off the bat, and that's what Judge Selma said in his decision. He said if it's not a genuine desire to accept, then the desire to accept requirement is meaningless. All you'd have to. So counsel, I understand. And the basis of your argument is that that's plainly that's plain language. And we should and we can just stop there by looking at the language. The district court thought it's ambiguous. So now he's going to admit extrinsic evidence. I don't think the district court made a decision about ambiguity. But even if there was a determination that the contract is ambiguous, that still doesn't go to a jury. It only goes to a jury if there are disputed issues of material fact that are relevant to how the contract is. My question is aimed at something a little bit different, which is the admissibility, whether it's a summary judgment or before a jury, of extrinsic evidence of intent. That is people coming in and saying this is what we negotiated and therefore that's what that's how you should interpret this language. OK. Did you have any extrinsic evidence that you admitted? We know we did not. And that's why there is no disputed issue of material fact. They had their witnesses come in and say, well, we always understood that this. Well, first of all, they didn't have any recollection of negotiating this agreement. But they did have testimony that said our general understanding was the roofer could be exercised freely. And the way that under California law it works is you provisionally accept extrinsic evidence to determine whether there's an existence of an ambiguity. In order to find that there is an ambiguity, you have to find that the plain language of the contract is reasonably susceptible to the interpretation that's being offered or that the extrinsic evidence purports to support. And here what they're saying is the extrinsic evidence is that these requirements did not have to be followed. They were just technicalities. And you could just essentially just ignore them because everyone understood. And that cannot be reconciled with the plain language of the contract. And so under contract law in California, in that first step, you say, well, if the plain language is not reasonably susceptible to this interpretation, that's the end of the inquiry. You can't use extrinsic evidence to contradict the plain terms of the contract. All right. Thank you, counsel. The case just argued will be submitted. We thank counsel for their helpful arguments in this case. And with that, we will stand in recess for 10 minutes. All right. This court stands in recess for 10 minutes.
judges: BYBEE, COLLINS, BRESS